51 CCPA
**Application of Wilhelm NEUGEBAUER, Martha Tomanek and Hans Behmenburg.**

**Patent Appeal No. 7097.**

United States Court of Customs and Patent Appeals.

April 9, 1964.

James E. Bryan, Washington, D. C., for appellants.

Clarence W. Moore, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals which affirmed the rejection of claims 126 to 162 in appellants' application serial No. 662,319, filed May 29, 1957, entitled "Photographic Reproduction." Thirty-one claims stand allowed.

The invention relates to electrophotography, in particular to chemical compounds which are photoconductive and thus useful as coatings for substrata on which it is desired to reproduce images. The compounds are 2,5-bis (para-aminophenyl)-1,3,4-oxadiazoles.

In electrophotography, a substratum (e. g., paper, glass, metal foil, etc.) is coated with a photoconductive substance (i. e., a substance whose electrical conductivity is dependent upon the amount of light to which it is subjected) to provide a surface upon which images are reproducible. The photoconductive layer, although not light-sensitive per se, is rendered so by applying to the coated article an electrostatic charge (e. g., by

corona discharge[1] ). Images to be reproduced are placed atop the charged surface which is exposed to illumination by conventional photographic methods, whereby the coating locally dissipates its charge in proportion to the intensity of illumination. Non-illuminated areas, which retain their charge, are then treated with electroscopic powder (e. g., colored synthetic resins) resulting in a visible image which may be transferred to another surface or may be fixed (e. g., by fusing), rendering the powder permanently adherent to the coated substratum.

The rejected claims define electrophotographic articles as well as a method of making them.[2] Claims 129, 130, 131 and 157 are representative (emphasis ours):

"129. An *electrophotographic material* comprising an *electrically conductive support layer* and a *photoconductive insulating layer,* the latter containing a compound having the formula

in which R, R$_1$, R$_2$, and R$_3$ are selected from the group consisting of hydrogen, alkyl, cycloalkyl, and acyl radicals; and X and X$_1$ are selected from the group consisting of hydrogen and halogen.

"130. An electrophotographic material according to claim 129 in which the photoconductive layer contains a *dyestuff sensitizer.*

"131. An electrophotographic material according to claim 129 in which the photoconductive layer contains an *organic colloid.*

"157. A method of making an electrophotographic material which comprises *coating* an electrically conductive support layer with a photoconductive insulating layer comprising a 2,5-bis-(p-aminophenyl)-1,3,4-oxadiazole."

The other rejected claims differ from the above claims in defining the oxadiazole compound with varying degrees of specificity. In article claims 141 to 156, specific oxadiazoles are recited. "Dyestuff sensitizers" according to appellants' specification are used to extend the sensitivity of the photoconductive layer "into the visible part of the spectrum * * *." Appellants disclose a host of dyes as applicable including triarylmethanes, xanthenes, thiazines, etc. "Organic colloids" are said to be "advantageous in preparing the photoconductive insulating layers" and may be natural and synthetic resins, synthetic polymers and the like. For what purpose they are "advantageous" is not expressly disclosed, but apparently they provide a fusible medium for fixation of the photoconductive layer after exposure.

The sole ground of rejection is unpatentability over the following reference:

Siegrist et al. 2,765,304 Oct. 2, 1956

In the Siegrist et al. patent, entitled "New Ox-Diazole Compounds and Process for their Manufacture," the patentees teach various oxadiazoles, the sole statement of utility of which is "for making *organic material* impenetrable to ultraviolet rays, for the optic brightening of *organic material* or as an intermediate

---

1. Van Nostrand's Scientific Encyclopedia defines "corona" as follows:
   "Specifically, in electrical engineering the corona is a luminous brush discharge which occurs between two conductors carrying extremely high voltage."
   In electrophotography, corona discharge is induced by maintaining high voltage in a thin wire around which the resultant intense electric field causes ionization of air. Ionized molecules collect on the coated article inducing a charge thereon as the wire is moved past the article surface.
   Appellants' corona discharge by which their photoconductive layer is sensitized is produced with "a charging apparatus maintained at 6000 volts * * *."

2. The allowed claims are drawn to the *method of using* the electrophotographic article.

product for the preparation of dyestuffs."
(Emphasis ours.) Such compounds also
"exhibit in solution or when applied to
a *substratum* a green-blue to violet
fluorescence in daylight or ultra-violet
light." (Emphasis ours.) Appellants
assert, and the Patent Office concedes,
there is no teaching in Siegrist et al. that
any oxadiazoles possess photoconductive
properties. Appellants concede that some
of the oxidiazoles of their claims are
disclosed by Siegrist et al.

We shall discuss separately the rejec-
tion of the article claims and method
claims.

### Article Claims

The Patent Office position is that the
reference teaches, or at least suggests, a
"backing member" upon which is coated
an oxadiazole *as ultraviolet brightener;*
that such "backing member" may be pa-
per which is "organic material"; and
that such coated paper would *inherently*
be an article defined by appellants' claims.
Stated another way, the Patent Office
position is that appellants' claims define
an article not distinguishable from a
coated paper suggested by Siegrist et al.

The examiner said:

"It is the Examiner's position that
the instant claims recite no new or
unobvious article even though the
intended use may be different.

"Siegrist et al clearly discloses
coating the composition on a 'back-
ing member', which is substantially
all the structure that is required
* * * [by appellants'] claims
* * * to be 'an electrophoto-
graphic material'. * * *

"The requirement in the instant
claims that the backing member be
'electrically conductive' is not seen to
define any significant structural
distinction since *any* material is
'electrically conductive', even the
best insulators known. In any event,
note that applicants may employ
such backing materials as glass or
paper * * *. The obvious and
well known use for ultra-violet ab-

sorbers and optic brighteners, the
utility suggested by the reference
* * * is in paints, inks, photo-
graphs, and coating compositions in
general, for example in the optical
brightening of paper. Nor is it
deemed unobvious to broadly classify
substrates into two distinct cate-
gories, i. e. conductive and non-con-
ductive, where there is no apparent
reason to limit the reference to non-
conductive substrates."

The board added:

"Appellants rely upon the pre-
amble directed to 'An electrophoto-
graphic material' to support patent-
ability of [the] article claims * *.

"We do not agree with appellants'
interpretation of the preamble
which, in our opinion, neither re-
quires specific structure nor suggests
a particular function. The term 'An
electrophotographic material' does
not indicate what structure other
than that specified in the terms of the
claims is required nor how said mate-
rial is to be employed in an electro-
photographic process. Thus, the pre-
amble differs from those considered
by the court in the decisions cited
in appellants' brief and in particular,
from the printing plate to which the
claims in In re Schmidt, 48 CCPA
1140; 772 O.G. 897; 293 F.(2d)
274; 130 USPQ 404 were directed.
* * *

"We further disagree with appel-
lants in that we must look to appel-
lants' specification to determine what
is intended by the claimed element,
'an electrically conductive support
layer', since this term is not of itself
clearly definitive. As pointed out by
the Examiner, appellants' description
includes as apparent representatives
of this element, a glass plate * * *
or paper sheets or webs * * *.
We note the paper sheets or glass
plates are not stated to be further
treated to make them additionally
electro-conductive and in fact, the
paper sheets are treated with coat-

ings which would be expected to tend to decrease electrical conductivity. Thus, we agree with the Examiner, in view of the disclosed representative examples of the otherwise undefined electrically conductive support layer, that the substrates to which reference is made in Siegrist et al., or which are suggested therein, must inherently fall within the terms of the claims.

\* \* \* \* \*

"Merely referring to a possible use for such an article, not specified in the reference, does not render the composite patentable. We consider the situation before us to be somewhat analogous to that in In re Rosicky, 47 CCPA 861; 755 O.G. 929; 276 F.(2d) 656; 125 USPQ 341, since we hold the teaching of the utility of the oxadiazoles in Siegrist et al. to suggest to the chemist the use thereof as applied to substrates including paper, fabrics, and other material falling within the terms of appellants' claims."

Appellants argue that the preamble of their claims, when considered in conjunction with the other claim limitations, distinguishes their invention structurally over Siegrist et al.; that "There is no disclosure in Siegrist et al. of a photoconductive insulating layer or an electrically conductive support layer" and that accordingly "these structural recitations of the claims are not met"; that the claims are "definitive of an article of manufacture" not taught by the reference; and that the preamble does not constitute a mere "use" limitation.

We agree with the Patent Office that Siegrist et al. fairly teach paper coated with oxadiazole as optical brightener. The issue then is simply whether appel-

lants' claims, read in the light of the disclosure distinguish the "electrophotographic material" over such coated paper.

As to the claim preamble, this court has frequently considered problems related thereto. See, e. g., Kropa v. Robie et al., 187 F.2d 150, 38 CCPA 858, and cases cited therein. We know no general rule for deciding the weight to be given preambles as positive structural limitations. Ellis,[3] for example, states "Preambles are used primarily to give the field within which the invention has utility. They designate *use* rather than *structure, form* or *composition.*" (Emphasis ours.)

■ In the instant case, we do not consider it to be controlling that the reference does not *in haec verba* disclose "electrophotographic material." The claims *as a whole* must be analyzed in light of the disclosure to see if the article defined thereby is distinguishable in fact, vis-à-vis *in verbis,* over the prior art.[4]

We first consider the limitation "electrically conductive support layer." As did the board, we look to the specification to see what appellants' claims mean. It says the support "may be of any material suitable for use in electrophotographic processes, for example, aluminum or other metal plates or foils; glass plates; *paper sheets* or webs, or plastic foil \* \* \*." (Emphasis ours.) The paper may be pretreated against penetration in a conventional manner by coating with methyl cellulose, polyvinyl alcohol or the like. In twenty examples, sixteen employ paper as the support layer, defined simply as "paper foil," "transparent paper" or "translucent paper." Appellants, in neither the disclosure nor their brief, indicate that such paper is of any special type, other than being "suitable for use in electrophotographic processes."[5] Ac-

3. Ellis, "Patent Claims," 1949, p. 210.

4. This principle, of general legal application, is immortalized in Latin : In verbis, non verba, sed res et ratio, quaeranda est. (In the construction of words, not the mere words, but the thing and the meaning, are to be inquired after.)

5. Subsequent to the brief, appellants' counsel submitted memoranda citing patents and technical journal articles, purporting to establish art-recognition of electrically conductive papers and glasses for electrophotography. The brief asserts "there is no reason why appellants should be re-

cordingly, we are not convinced that a typical paper substrate suggested for use by Siegrist et al. is not "electrically conductive" as contemplated by appellants.

Appellants' "photoconductive insulating layer" may be an oxadiazole per se or mixtures thereof, or may be oxadiazoles in admixture with dyestuff sensitizers or organic colloids, discussed supra. As to coatings of oxadiazole per se, upon which we believe the phrase "photoconductive insulating layer" reads, nothing in the record indicates such a layer to be unlike oxadiazole coatings for ultraviolet reflecting. Merely calling the coating a "photoconductive insulating layer" does not make it any the less an admittedly old oxadiazole. Thus we hold that claims reciting an "electrically conductive support layer" and a "photoconductive insulating layer * * * containing * * [oxadiazole]" do not therein distinguish over Siegrist et al.

■■■ However, we do not agree with the board that claims which require that "dyestuff sensitizer" or "organic colloid" be present *in the photoconductive layer* do not distinguish over Siegrist et al.[6] Nothing in the reference suggests dyestuff sensitizers or organic colloids *in admixture* with oxadiazoles, such admix-ture then used *as a coating*. A claim to such a combination of coating and support layer defines an article structurally different from any taught by Siegrist et al.

Thus, we hold the claims reciting that the "photoconductive insulating layer" *contains* oxadiazole do not distinguish over Siegrist et al. while the claims which recite "dyestuff sensitizer" and "organic colloid" as part of the "photoconductive insulating layer" do so distinguish.

## Method Claims

Method claims 157 to 162 recite simply "coating" a support layer with photoconductive insulating layer. The examiner stated:

"Claims 157 to 162 do not distinguish over the references [sic] in that they merely recite the obvious method for preparing the article, i. e. by 'coating'."

The board added:

"Process claims 157 to 162 are directed to a single-step method which comprises 'coating'. As pointed out in appellants' specification * * * the coating is applied 'in known manner'. Hence the claimed step functionally defined in terms

---

quired to recite in the specification that which is notoriously old in the art."

We have reviewed the citations but find nothing therein to support appellants' position. None of the electroconductive papers listed are related directly to electrophotography but rather to facsimile recording in telegraphic transmission. The paper in one instance is specially made by incorporating graphite or metal particles into raw pulp to lower the resultant paper's electrical resistance. In another type, ordinary paper is penetrated with metal conductor.

Appellants' specification discloses nothing from which we can justifiably conclude that their "electrically conductive" support layer is intended to be, inter alia, specially fabricated papers as are used in facsimile recording.

6. The board sustained the examiner's position which was that "The 'organic colloid' * * * and the 'dyestuff sensitizer' * * * are likewise deemed obvious from, if not inclusive in the disclosure of Siegrist

et al. For example the 'organic material' referred to by the reference * * * obviously includes 'organic colloids', since ultraviolet absorbers are conventionally included in such materials (e. g. plastic sunglasses, protective paints, etc.). Likewise, such materials as paints, inks, paper coatings, etc. obviously may include the conventional dyes * * * [in] the instant disclosure * * *."

Appellant points out that "There is no disclosure in the present application of the use of 'organic colloids' as a substratum. * * * an organic colloid may, if desired, be incorporated *in the photoconductive layer* which is *then* applied *to* a substratum [our emphasis]. * * * The organic material referred to in the Siegrist et al patent is, in fact, the *substratum* whereas the organic colloid recited in certain of the claims on appeal is *not* the substratum but a material which may, if desired, be incorporated in the photoconductive insulating layer."

of its result cannot differentiate over the application to a substratum taught in Siegrist et al. and is apparently obvious to one having ordinary skill in this art."

Appellants urge in their brief "that while it may be obvious to prepare the article by coating once the article is known, it certainly can not be obvious to prepare the article by such a process when the article is unknown and, absent appellants' disclosure, there is nothing to teach the claimed article."

We agree with the board. Appellants' coating process appears to be conventional and therefore obvious. The fact that the final product is novel is not controlling of obviousness of the method. In re Larsen, 292 F.2d 531, 49 CCPA 711.

For reasons above stated, the decision of the board is affirmed as to claims 126, 129, 132, 135, 138 and 141 to 162; and is reversed as to claims 127, 128, 130, 131, 133, 134, 136, 137, 139 and 140.

Modified.