Eugene F. Buell, Buell, Blenko & Ziesenheim, Pittsburgh, Pa., attys. of record, for appellant.

Joseph Schimmel, Washington, D. C., for Commissioner of Patents. Jack E. Armore, Washington, D. C., of record.

Before RICH, Acting Chief Judge, DURFEE and NEESE, Judges, sitting by designation and ALMOND and BALDWIN, Associate Judges.

RICH, Acting Chief Judge.

This appeal is from the decision of the Patent Office Board of Appeals, adhered to on reconsideration, affirming the rejection of claims 1, 2, and 6 of application serial No. 352,337, filed March 16, 1964, entitled "Methods and Compositions for Removing Alluvium and Other Deposits in Water Systems." Six claims have been allowed.

The appealed claims are for a method (claims 1 and 2) and composition (claim 6) useful for removing and preventing alluvium deposits in water systems where the water employed is derived from "rivers, ponds, lakes or other sources of impure natural waters," as, for example, in industrial cooling systems. The meaning which appellant ascribes to the term "alluvium" appears from the following excerpt from his specification:

> * * * silt, mud, and/or organic wastes and other accumulations [in natural waters] which deposit on heat exchange surfaces and create problems of corrosion, loss of heat transfer efficiency, and the like, as well as reducing the area of the passageways and thus the amount of cooling water which can be circulated.

Locations where such alluvium may present such problems, mentioned in the specification, include cooling systems in blast furnaces, open-hearth furnaces and the like in the steel industry; cooling towers in the oil industry; surface condensers associated with turbine generators; pipes, sewers, and heated water lines; and ship ballast tanks into which river water may be pumped.

Appellant has discovered that deposits of alluvium in such water systems can be removed and prevented by adding to the water in the systems "insoluble potassium metaphosphate and a solubilizing agent therefor."

The appealed claims read:

1. The method of removing and preventing alluvium deposits in water systems which comprises adding to such systems insoluble potassium metaphosphate and a solubilizing agent therefor.

2. The method of removing and preventing alluvium deposits in water systems which comprises adding to such systems insoluble potassium

metaphosphate, a solubilizing agent therefor and a compatible dispersing agent.

6. A composition for removing and preventing alluvium deposits in water systems consisting essentially of insoluble potassium metaphosphate, a solubilizing agent therefor and a compatible dispersing agent.

The references relied on are:

Primary: French Patent 901,765 Nov. 13, 1944
Secondary: Zimmie et al. 3,085,916 Apr. 16, 1963
Freedman 3,173,864 Mar. 16, 1965
(filed Feb. 8, 1961)
Betz Handbook of Industrial Water Conditioning, 5th Ed., 1958, pages 148–178.

---

The rejection of the three appealed claims is on the ground of unpatentability over the French patent alone or in view of each of the secondary references, no statutory ground having been stated. The solicitor's brief says it may be considered to be based on both 35 U.S.C. §§ 103 and 102(b). We will so treat it.

The French patent discloses the treatment of "industrial waters," without any amplification of the meaning of that term with respect to the source of the water. The only purpose for which the examiner cited the secondary references, in the words of the final rejection, was "primarily only to show that all industrial cooling waters contain deposit-forming sand, silt, mud, etc., which is considered to be the 'alluvium' recited." A different examiner, writing the examiner's Answer, amplified this somewhat but took essentially the same position. The board treated them in accordance with the statement in the final rejection.

Appellant acknowledges that the French patent discloses addition of "insoluble potassium metaphosphate and a solubilizing agent therefor" (the same materials employed by appellant) to "industrial waters" used in industrial heating and cooling water systems for the purpose of *preventing the deposition of calcium carbonate scale* in such systems. Appellant also tacitly acknowledges that the recitation of "a compatible dispersing agent" in claims 2 and 6 is not in itself of patentable significance. Appellant contends, however, that the French patent does not disclose that alluvium was present in the "industrial waters" treated and that, in any event, *the French patent does not disclose or suggest that alluvium deposition, as well as calcium carbonate deposition, from industrial waters can be prevented by adding thereto the composition employed by appellant and the French patentee.*

We agree with appellant that it is necessary to observe a distinction between the deposition of scale, which is the subject expressly dealt with by the French patent, and the problem of removing or preventing the accumulation of alluvium. Scale and alluvium have different origins and causes and cannot always be prevented or removed in the same ways. This is clearly shown by appellant's specification and by the prior art references.

The peculiar—if not unique—aspect of this case is that it *so happens* that the *scale* prevention method and compositions of the French patent are also effective to remove and prevent alluvium accumulations in water systems. The question here is whether that suffices to negative the patentability of the appealed claims. A corollary question which is strenuously debated by both parties is whether those skilled in the art would know, from the teaching of the French patent, that its *scale* prevention technique is also effective to pre-

vent or remove deposits of alluvium, the latter being appellant's discovery. These are the questions we must decide.

To make the matter clear it is necessary to develop somewhat further the differences in the essential natures of the two problems. Alluvium, as above indicated, consists of materials in the nature of silt, such as mud, organic matter, fine sand, and rust, which come into the water system in suspension and tend to settle out and clog up the apparatus or fill up such vessels as ballast tanks. Appellant's brief characterizes it as a gravity problem. The application at bar explains that a ballast tank on a river boat, for example, instead of filling up with silt which has to be shovelled out periodically, when filled with water treated in accordance with the invention, does not silt up. Rather than settling, the silt remains light and fluid and readily drains out along with the water. In other words, it remains in suspension and is no problem. Appellant says it is a flocculation phenomenon.

Scale, on the other hand, is a chemical deposition, primarily of calcium carbonate, which deposits on the metal surfaces and adheres to them. The French patent explains that scale formation is the result of temperature change which causes insoluble calcium carbonate to form from soluble calcium bicarbonate which is in solution in the water. Prior to the French patent, various water-treatment methods were known for preventing scale deposition, including treatment with certain *soluble* phosphate compounds. The invention of the patent resided in the use of particular phosphate compounds, namely, insoluble alkaline metaphosphates in combination with a solubilizer such as sodium sulfate or sodium chloride. It was discovered that less of the latter would produce the desired effect than with the soluble phosphates. The patent explains the mechanism thus:

Consequently in the process of inoculation with phosphates, no chemical transformation of the scale-forming elements is involved, but an effect of surface activity. The lime carbonate particles of the industrial water, in a supersaturated solution, are prevented from growing and therefore from being deposited, by the surface active properties of soluble sodium hexametaphospate. [The prior art method.]

It has been found that such a subcolloidal effect is further augmented by treating the industrial waters with insoluble alkaline metaphosphates (Kurrol's salts), e. g. potassium metaphosphate. * * * By adding alkaline metaphosphate insoluble in water, brought into the colloidal dispersion state by a peptizing agent, the calcium carbonate originating from the calcium bicarbonate by thermal variations is much more efficiently prevented from forming germs or cores than by soluble alkaline metaphosphates, so that neither crystallization nor deposition takes place.

██ Appellant necessarily concedes that his composition, as defined in composition claim 6, is to be patentably distinguished, if at all, from the compositions disclosed in the French patent only by the statement of intended use in the claim: "A composition for removing and preventing alluvium deposits in water systems * * *." A mere statement of a new use for an otherwise old or obvious composition cannot render a claim to the composition patentable. As we said in In re Lemin, 326 F.2d 437, 51 CCPA 942 (1964),

Appellants are clearly correct in demanding that the subject matter as a whole must be considered under 35 U. S.C. § 103. But in applying the statutory test, the differences over the prior art must be more substantial than a statement of the intended use of an old composition. * * * It seems to us that the composition * * * would be exactly the same whether the user were told to cure pneumonia in animals with it * * * or to promote plant growth with it (as here). The directions on the label will not change the composition * * *.

Since the composition recited in claim 6 is not rendered patentable by the recitation of intended use, the rejection of claim 6 must be *affirmed*.

As to the method claims 1 and 2, the situation is different. First of all, there is express statutory authority for a patent on a process which is a new use of a known process, composition of matter, or material, 35 U.S.C. §§ 100(b) [1] and 101,[2] provided, of course, the process predicated on the new use is new and unobvious and not subject to a statutory one-year time bar. 35 U.S.C. §§ 102 and 103. We come back, therefore, to the question of whether it would have been obvious to *use* the admittedly old composition, disclosed in the French patent as useful to prevent *scale* formation in water systems, to prevent the settling out of alluvium and to remove previously deposited alluvium in view of the references. If it would not be obvious to use the old composition for this purpose, then we think appellant is entitled to his process or method claims.

Appellant insists that there is not a word in the French patent about preventing alluvium deposition and the Patent Office cannot deny this, for there is not. Appellant urges, furthermore, that he has advanced the art by teaching it something it did not know which was also unobvious.

The Patent Office counters with the argument that the secondary references make it clear that "industrial waters," mentioned in the French patent as the subject of treatment to prevent scale, do contain alluvium and, this being so, the alluvium would *inherently* be removed. Assuming the operability of appellant's invention, this cannot be disputed; but appellant says this presents a classic example of accidental use, unrecognized by the art, without profit to the art, and therefore without legal significance as an anticipation. He cites Pittsburgh Iron & Steel Foundries Co. v. Seaman-Sleeth Co., 248 F. 705 (3rd Cir.1917); Becket v. Coe, 38 USPQ 26 (D.C.Cir. 1938); Ex parte Hehemann, 57 USPQ 155 (Bd.App.1942); Ex parte Crampton, 21 USPQ 644 (Bd.App.1924); and Becket v. Arness, 112 F.2d 1011, 27 CCPA 1251 (1940), in support of his contention. The first case seems in point, the others not. He further asserts that though twenty years and more have passed since the French patent issued in 1944 no one, before his invention, solved the alluvium problem in the manner he claims.

The solicitor attempts to meet this by arguing that the four specific examples of the French patent teach those skilled in the art that the disclosed treatment was removing or preventing alluvium deposit because (a) they would assume the waters contained alluvium and (b) the examples show the "process avoided *all* scaling or incrustation when employing large quantities of the waters for long periods of operation * * *." He claims it is evident "that no accumulation of *any* kind developed in the water cooling systems." Our study of the examples, however, gives us no such assurance that those skilled in the art would reach the conclusions the solicitor thinks they would. (Emphases in discussing the examples will all be ours.) Example 1 says only: "Thus any *scale* formation was prevented," referring to a closed-circuit cooling water system. Example 2, an open-circuit circulation water system in an industrial arrangement, contains the vague statement:

After employment of these agents for months, the observations made with respect to the degree of activity of the

---

1. 35 U.S.C. § 100(b) reads:
   (b) The term "process" means process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material.

2. 35 U.S.C. § 101 reads (emphasis ours):
   Whoever invents or discovers any new and useful *process*, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

insoluble metaphosphate *against scale deposits* have not met with any objection.

Example 3, apparently dealing with the condenser in a turbo-system of some kind, says that after 15 months "their *tubes* were found absolutely clean. *Scale formation* as it used to be found formerly after the same periods of operation were no longer in existence." Example 4, dealing with "cooling water" apparently used in condensers of a "turbo-plant," reports these results after "several months," apparently at least four:

> The *scale containing calcium carbonate* which formerly covered the condenser tubes of a turbo-plant thickly covered with *scale* before the employment of phosphated mixture, was progressively dissolved. * * * The inlets and outlets of the condensers which had been cleansed by the employment of phosphate had remained entirely free *of scale*.

This is all we can find in the four examples about the alleged freedom from "*all* scaling or incrustation." It is clear that only scale is discussed and nothing is said about "incrustation" of any other kind, either when the invention was in use or when it was not in use. For all the examples show, none of the installations in which the tests were carried out ever had any kind of an alluvium deposit problem at any time. The "industrial water" may even have been filtered. We cannot find that the phenomenon appellant claims to have discovered would have been suggested to the art.

It is interesting to note that the patent to Zimmie, filed seventeen years after the French patent issued, says:

> It is presently the practice to remove most of the large particles of mud, dirt, sand, or the like from the water by passing it through a screen before it goes to the cooling system. * * * there is an urgent need for a commercial method of preventing mud of river water, or the like, from accumulating in these cooling systems.

There is likewise a need for a method of removing these mud deposits once they have accumulated. This is particularly true in industrial cooling systems where large volumes of river water are used, such as those found on electric furnaces, compressors, generators, transformers, soaking pits, motors, reheating furnaces, and the like.

The record does not show that the French patent provided the obvious solution to the problem in 1944.

The solicitor has relied on In re Tomlinson, 363 F.2d 928, 53 CCPA 1421 (1966), with respect to the method claims, in support of his argument that the introductory use clause of these claims—"The method of removing and preventing alluvium deposits in water systems"—does not serve to patentably distinguish them from the prior art, particularly the French patent. We have reviewed the *Tomlinson* case and while there is some broad language in our opinion therein we distinguish it for the reasons hereinafter stated.

In *Tomlinson*, the process claims recited "A process of inhibiting degradation of polypropylene caused by exposure to light which comprises admixing * * * polypropylene and a stabilizing quantity of dithiocarbamate * * *." The Tholstrup reference therein relied upon disclosed stabilizing of polypropylene, albeit not against *light* degradation, and showed the combination of polypropylene with the particular dithiocarbamate claimed. This court, therefore, found novelty lacking as to the claimed *composition* of Tomlinson and further found the *process* claims "unpatentable by reason of their reading on an obvious process, the admixing of polypropylene and a nickel dithiocarbamate, an old mixture." The introductory use clause of the process claims was found to state no more than the *result* of admixing the two materials, with Tomlinson finding only a property in the *old composition*, not a new use in the dithiocarbamate. The situation before us dif-

fers from that of *Tomlinson* since that element of the process claims on appeal that corresponds to the "polypropylene" of Tomlinson's claims is "water systems" which, in the context of the claims and in the light of the specification, must be read as "water systems containing alluvium." As above pointed out, there is nothing of record to show that the water systems of the French patent contained alluvium or that its presence was contemplated; hence, unlike *Tomlinson* where polypropylene was disclosed in the reference, water systems containing alluvium are not disclosed in the French patent.

■ Since we do not find the process, as claimed, obvious or anticipated, the rejection of claims 1 and 2 is *reversed*. The rejection of claim 6 is *affirmed*.

Modified.

BALDWIN, Judge (dissenting in part).

As to composition claim 6, I agree with the majority opinion and decision to affirm.

As to method claims 1 and 2, I would affirm the 35 U.S.C. § 102 anticipation rejection. Claims 1 and 2 are broad enough to read on the very slightest removal and prevention of alluvium deposits in water systems. Thus, if the "industrial waters" of the French patent contain alluvium, even in a very slight amount,[1] then the process of that patent inherently anticipates appellant's process *as claimed here*. Viewed in this manner, I do not feel that the *presently claimed* process possesses the element of novelty required of a "new use of an old composition." Perhaps appellant has discovered an unrecognized characteristic, property, or advantage of an old process for treating industrial waters by the addition of a known composition; nevertheless, in my view claims 1 and 2 do not define *solely* a new process. The *obviousness* of a method for removing

and preventing *substantial* alluvium deposits in water systems using unfiltered industrial water containing a specified minimum amount of alluvium, is quite a separate and distinct issue from the *lack of novelty* or *inherent anticipation* of the process *claimed here*. The difficulty in this case arises from the breadth of the claims, not the obviousness of the *disclosed* method. Therefore, as to claims 1 and 2 also, I would *affirm*.

United States Court of Customs and Patent Appeals.
June 26, 1969.

---

1. It would seem that *some* amount of "alluvium," as defined by appellant, is even present in most drinking water.