NEWMAN, Circuit Judge,
dissenting from the denial of rehearing en banc.
The court has not accepted the suggestion that this case be reviewed en banc, and the panel was unpersuaded by the argument that the decision is incorrect when the law of precedent is applied. I write separately because the panel’s statement of the applicable law and its application to the facts of this case are inconsistent with the court’s precedent. Our obligation as an appellate court is to assure that the law is both correctly stated and correctly applied. When inconsistency is raised by the panel’s treatment, our obligation is to assure that conflicts with precedent — whether real or apparent — are resolved, as well as to assure that the law is correctly applied. From the court’s denial of rehearing en banc, I respectfully dissent.
The ruling in this case has important policy as well as legal implications, as the many amici curiae point out, each side stressing a different aspect of the effect on commercial activity in the pharmaceutical field. Both sides acknowledge that the effects of chemical changes on properties of medicinal products is not predictable; the difference residing in the panel’s acceptance of the long-discredited “obvious to try” standard, on which the panel superimposes the theory that the skill of these inventors guided them to trial of the besy-late salt (despite the prior art’s preference for the maleate salt), thereby negating pat-entability. The panel’s application of the obvious-to-try standard is in direct conflict with precedent; it has long been the law that “patentability shall not be negated by the manner in which the invention is made.” 35 U.S.C. § 103. In Gillette Co. v. S.C. Johnson & Son, Inc., 919 F.2d 720, 725 (Fed.Cir.1990) this court stated that “we have consistently held that ‘obvious to try’ is not to be equated with obviousness.” In In re Tomlinson, 53 C.C.P.A. 1421, 363 F.2d 928, 931 (1966) the court explained that “there is usually an element of ‘obviousness to try’ in any research endeavor, that ... is not undertaken with complete blindness but rather with some semblance of a chance of success.” The amici curiae representing research pharmaceutical industries in this petition point out that methodical experimentation is fundamental to scientific advance, and particularly for biological and medicinal products, where small change can produce large differences. At the trial there was no contradiction to the testimony of Pfizer’s expert witness Dr. Anderson that “one of ordinary skill in the art could neither draw any conclusions nor have any expectations about the properties of amlodipine besy-late from the properties of a besylate salt of a different compound.” Pfizer Br. at 7. Indeed, the parties stipulated this scientific fact.
Nor was there any evidence contradicting Pfizer’s position that “the superior properties at issue were not some abstract concept of ‘good’ properties, but specific properties which solved both the sticking and instability problems of the prior art, while providing non-hygroscopicity and good solubility_Trade-offs in salt properties are the rule, and one of skill must usually accept some undesirable properties *1380 to achieve other desirable ones. Amlodi-pine besylate, unlike any other amlodipine salt, presented no tradeoffs.” Id. The panel further erred in declining to give weight to these acknowledged “secondary considerations” of unexpected results. See Richardson-Vicks, Inc. v. Upjohn Co., 122 F.3d 1476, 1483 (Fed.Cir.1997) (evidence of unexpected results must be considered); Ruiz v. AB Chance Co., 234 F.3d 654, 667 (Fed.Cir.2000) (“Our precedents clearly hold that secondary considerations, when present, must be considered in determining obviousness.”)
The panel decision changes the criteria as well as the analysis of patentability, with results of particular significance for their effect on the conduct of R & D, the costs of drug development, and the balance between generic access to established products and the incentive to development of new products. The amici curiae on both sides of the issue stress different policy considerations: the pharmaceutical research companies point out that diminished access to patenting will affect the kind and direction of product development; the generic producers point out that the sooner they can enter the market for established drugs, the lower the consumer price. The placement of the balance in this ever-present conflict between innovator and copier has long engaged the public and Congress, and needs must continue to do so. Meanwhile, however, it is inappropriate for a panel of this court to make a change in the precedent by which both sides of the debate have heretofore been bound.
Stability of precedent and the uniform application of correct law to achieve the correct result are the assignment of the Federal Circuit, for our rulings are of nation-wide effect. A primary purpose for which our court was formed was to provide the judicial stability that supports commercial investment-this was a unique judicial role, and was adopted in recognition of the dependence of technology-based industry on an effective patent system. It was recognized that a nationally uniform, consistent, and correct patent law is an essential foundation of technological innovation, which is today the dominant contributor to the nation’s economy. See the Report of the Domestic Policy Review of Industrial Innovation, Department of Commerce 1979 (stressing the need for judicial administration of correct and uniform patent law). In enacting the implementing statute, Congress explained:
The purpose [of establishment of the Federal Circuit] is to resolve some of the myriad structural administrative and procedural problems that have impaired the ability of our Federal courts to deal with the vast range of controversies among our citizens and to respond promptly and meaningfully to their demands for justice ... which include the inability of our present system to provide a prompt, definitive answer to legal questions of nationwide significance ...
S. Comm, on the Judiciary, Federal Courts Improvement Act of 1981, S.Rep. No. 97-275, at 1 (1981).
When conflicts arise between panel decisions of the Federal Circuit the ensuing uncertainty is of national scope, contravening the purpose of establishing this court. This adds weight to our obligation to undertake en banc review, both to reestablish consistency in the law and to correct errors in panel decisions. In 1998, in a letter to the Commission on Structural Alternatives for the Federal Courts of Appeals, Justice Scalia wrote:
[T]he function of en banc hearings ... is not only to eliminate intra-circuit con *1381 flicts, but also to correct and deter panel opinions that are pretty clearly wrong_ The disproportionate segment of [the Supreme Court’s] discretionary docket that is consistently devoted to reviewing [a regional court of appeals’] judgments, and to reversing them by lop-sided margins, suggests that this error-reduction function is not being performed effectively.
Letter dated Aug. 21,1998, Hearing before the S. Subcomm. on Administrative Oversight and the Courts of the S. Comm, on the Judiciary, 106th Cong. 72 (1999).
Justice O’Connor wrote in similar vein:
It is important to the federal system as a whole that the Courts of Appeals utilize en banc review to correct panel errors within the circuit that are likely to otherwise come before the Supreme Court.
Letter dated June 23, 1998, id. at 71.
For the Federal Circuit, it was intended and expected that this court would provide uniform national law in all of the fields assigned to our exclusive jurisdiction; not only in patent law. Our cases are rarely factually simple, and when there arise apparently divergent panel statements of the law and its application, the responsibility for en banc review looms large. The goal of judging is “full, equal and exact” enforcement of the law. See Roscoe Pound, “The Etiquette of Justice,” 3 Proceedings Neb. St. Bar Assn. 231 (1909) (“full, equal and exact enforcement of substantive law is the end” of the judicial process). Through the system of en banc review, courts can remedy panel lapses, if indeed this decision represents such a lapse, or uniformly adopt panel advances in the law, if indeed this decision represents such an advance. From the court’s decision to decline this review, I must, respectfully, dissent.